151 P.2d 329

**LOGAN v. EMRO CHEMICAL CORPO-
RATION (MORGAN, Intervener).**

No. 4839.

Supreme Court of New Mexico.

Aug. 28, 1944.

Rehearings Denied Sept. 14, 1944, and
Oct. 7, 1944.

Hervey, Dow, Hill & Hinkle and W. A. Dunn, all of Roswell, for defendant-appellant.

H. C. Buchly, of Roswell, and Golden, Croley & Howell, of Dallas, Tex., for appellant-intervenor.

Albert H. Clancy, of Santa Fe, and R. T. Mcador, of Dallas, for appellee.

THREET, Justice.

This is an equitable action by appellee, Charles E. Logan, individually, and as trustee for Scott Etter, for the balance of the

purchase price of certain sodium mining leases, and for a foreclosure of a vendor's lien, claimed under an option to purchase from S. P. Yates, and others, against appellants, Emro Chemical Corporation; Etz, Myers & Robertson, a corporation; San Andres Production Corporation and George Etz, E. H. Robertson and Herb Myers. William F. Morgan intervened. Intervenor prayed for the foreclosure of his mortgage and the establishment of his lien as superior to the lien of appellees. From a judgment in favor of appellees, and the foreclosure of a vendor's lien, superior to intervenor's mortgage, appellant, Emro Chemical Corporation and intervenor, William F. Morgan appeal.

The facts found by the trial court, material to a decision are, substantially, as follows:

On the 24th day of May, 1941, Scott Etter, designated as "buyer," entered into a written option contract with S. P. Yates and others, designated as "sellers," whereby the sellers sold and conveyed to the buyer, his assigns or any person, firm, corporation or syndicate to whom the buyer might, in writing, designate, for a period of 90 days, the right to purchase all the right, title and interest of the sellers in and to certain leases, permits, operating agreements and applications, described in the option contract, for the sum of $12,500 plus expenses, rental payments and attorneys fees incurred by the sellers. Scott Etter, at the time, was acting for himself and as trustee for Charles E. Logan, and the leases, permits

and operating agreements, described in the option contract, were owned and held by the plaintiffs, Charles E. Logan and Scott Etter.

On or about July 17, 1941, Etz, Myers & Robertson, a corporation, entered into a contract with Charles E. Logan, acting for himself and Scott Etter, for an assignment of the option contract and agreement covering all the leases, permits, operating agreements and applications for a consideration of $18,000 in cash, and the issuance of 500 shares of preferred stock to Charles E. Logan and the same amount to Scott Etter in a corporation to be organized by Etz, Myers & Robertson. The corporation was to be organized with some 350,000 to 400,000 shares of stock, with 10,000 shares of preferred stock, all of no par value. The preferred stock, to be issued to Charles E. Logan and Scott Etter, was to have a guaranteed dividend of $6 per share, payable quarterly, and was to be secured by a lien on the leases, permits and operating agreements described in the option contract.

On the 9th day of August, 1941, Scott Etter and wife, for themselves and Charles E. Logan, at the request of Etz, Myers & Robertson, a corporation, and the Emro Chemical Corporation, assigned all their rights, title, and interest in and to the contract to the Emro Chemical Corporation, which was organized by Etz, Myers & Robertson on the second day of August, 1941. On the same day, to-wit: August 9, 1941, the Emro Chemical Corporation entered in-

to a contract with the plaintiffs, Charles E. Logan and Scott Etter, to purchase the option contract and also all of the mining rights, thereunder, together with an operating agreement, No. 059248, dated August 9, 1939, belonging to Scott Etter. The consideration for this agreement was that the Emro Chemical Corporation would assume the obligation of the contract made by Etz, Myers & Robertson, a corporation, with Charles E. Logan and Scott Etter under date of July 17, 1941, with the modification, that, in lieu of issuing the preferred stock in the corporation at a stipulated dividend of $6 per share per annum, the Emro Chemical Corporation would cause to be issued 500 shares of its preferred stock to Charles E. Logan and 500 to Scott Etter of the par value of $10 per share. The Emro Chemical Corporation further agreed, in lieu of any and all overriding royalties from production upon the properties, to pay Charles E. Logan and Scott Etter, each, the sum of $3,000 per annum in cash, payable quarterly, at the end of each quarter. The first payment was to be made on the 12th day of November, 1941, and continuing during the entire time the corporation should operate the properties, with the proviso that any and all amounts received by Charles E. Logan and Scott Etter, by way of dividends upon their preferred stock, should be deducted from the first payment to be made after the receipt of such dividends. The preferred stock was to be issued on August 12, 1941, and deposited in the Mercantile National Bank of Dallas, Texas, where it should remain during the existence of the contract, and not to be sold or transferred until the contract terminated.

The court further found that the defendant, Emro Chemical Corporation, by the assignment of the option contract, received all the leases, permits, operating agreements and all the property described in the option contract, and is now the owner thereof. That the defendant, Emro Chemical Corporation, is indebted to Charles E. Logan and Scott Etter, on account of seven quarterly payments, in the sum of $10,500, less two payments of $500 each, together with interest at the rate of 6% from maturity and costs of suit. That the plaintiff and Scott Etter have and hold an implied lien on all the leases, permits, operating agreements and properties, described in the option contract, for the sum of $9,500, together with interest thereon at the rate of 6% per annum on all quarterly payments maturing up to May 12, 1943, and for such further sums as may fall due under the terms of the agreements for compensation and costs of suit.

That plaintiff, Charles E. Logan, expended the sum of $320, as rental for the year of 1942, on the J. F. Forehand lease, which was necessary to keep the lease in full force and effect, and is entitled to recovery from the defendant, Emro Chemical Corporation, the sum of $320 in addition to the sum due plaintiff and Scott Etter on the purchase price of the lease, permits and applications;

and is entitled to have that sum added to the balance due on the purchase price of the properties.

The defendant, Emro Chemical Corporation, through its attorneys, at the trial and in open court, tendered to plaintiff certificates of preferred stock in the defendant corporation for 500 shares each, dated August 12, 1941. On account of lack of funds, no operations have been carried on upon the properties, except further development by drilling wells thereon to test the mineral bearing qualities of the properties. The defendant, Emro Chemical Corporation, has had no income from the property, and is now indebted in the sum of $36,000.

The court further found that the intervenor, on January 28, 1942, indorsed the defendant's, Emro Chemical Corporation's, note to the Mercantile National Bank of Dallas, Texas, for the sum of $15,000, due May 28, 1942, with the understanding, that the defendant corporation would execute and deliver to the intervenor, immediately, a mortgage on the properties in suit. The $15,000 was spent by the defendant corporation in the furtherance of its corporate business. The note not being paid when due was renewed for a period of sixty days, and was finally paid by the intervenor, who procured an indorsement of the renewal note to him from the bank. That by constant endeavor from January 28, 1942, to October 27, 1942, the intervenor procured the defendant, Emro Chemical Corporation, to execute and deliver to him its note, dated October 27, 1942, for the sum of $15,-000, due ninety days after date, secured by a mortgage, of even date, duly filed and recorded on December 21, 1942. Such mortgage was given in compliance with the agreements between the defendant corporation and intervenor under date of January 28, 1942. The defendant corporation defaulted in the payment of the note, which is now past due, and it has been placed in the hands of intervenor's attorneys for collection.

That intervenor had no actual notice or knowledge of the claims of the plaintiff either at the time he indorsed the renewal note, or at the time he took the note and mortgage on October 27, 1942; neither did he have actual notice of lis pendens, filed on July 18, 1942, nor of the filing and recording of the letters between Charles E. Logan and Etz, Myers & Robertson, a corporation, nor of the agreement for compensation between Charles E. Logan and Scott Etter and the Emro Chemical Corporation.

That, on the 18th day of July, 1942, plaintiff filed notice of lis pendens in the office of the County Clerk of Eddy County, New Mexico, of which intervenor was bound to take notice. That, prior to the execution and recordation of intervenor's mortgage, all the contracts in suit had been filed and recorded in the office of the County Clerk of Eddy County, New Mexico. That intervenor had record notice of the contracts, so recorded, and had due and legal notice of the rights of the plaintiff and took his mortgage subject thereto.

That intervenor had an equitable lien on the properties in suit, of which plaintiff had no knowledge, from January 28, 1942, which was merged in the mortgage of October 27, 1942. That intervenor's mortgage is a second lien, subject to plaintiff's lien, upon the properties of the defendant corporation.

Based upon these findings of fact, the court concluded that the plaintiff has and holds an implied vendor's lien upon the leases, permits, operating agreements and properties, described in the option contract, which is a purchase money lien, and is entitled to a decree foreclosing the lien in accordance with the rules and procedure in force in this state, for the sum of $9,820, interest and costs; and that the properties should be sold to satisfy plaintiffs' lien which is a first and paramount lien on the properties, subject to all statutory rights of redemption of the property by the defendant or intervenor.

Appellant's assignments of error are:

"1. The court erred in its finding that defendant acquired the property involved in this action by assignment from the plaintiffs or either of them.

"2. The court erred in its finding that the defendant was or is indebted to the plaintiffs as set forth in the court's finding of fact and conclusions of law. .

"3. The court erred in finding and decreeing that plaintiffs acquired and held their implied vendor's lien on the property involved in this action.

"4. The court erred in treating the contract of 17 July, 1941 as in any wise superseded by the later document of 9 August, 1941.

"5. The court erred in holding this action to be within the jurisdiction of equity, not dismissing the case on the ground that plaintiff has an adequate remedy at law."

Appellant's points 1 and 2, which will be considered together, are:

"The only vendor's lien that could have arisen under the facts of this case would have been in favor of Yates as lessee in possession of the property here in question. If such a lien ever existed it has been satisfied."

"No vendor's lien was ever within the contemplation of any of the parties to this action, and by their conduct, proposals and agreements, the appellees excluded themselves from asserting any claim of lien, either expressed or implied."

These propositions call for an examination and a construction of the contracts between the parties.

Appellant argues that the holder of an option to purchase does not have an interest in land, prior to the exercise thereof, and states that the only vendor's lien that could have arisen under the facts in the case at bar would have been in favor of S. P. Yates as lessee in possession of the property in suit. It also urges that, if a vendor's lien was within the contemplation of the parties, appellees, by their con-

duct, proposals and agreements have waived the right to assert such lien.

As to whether or not appellees acquired an interest in the real estate in suit by virtue of the option purchase is a question on which the courts apparently are divided. In Chapman et al. v. Great Western Gypsum Co. et al., 216 Cal. 420, 14 P.2d 758, 760, 85 A.L.R. 917, it is said:

"There are apparently two lines of authority on this subject, one holding that before its exercise the owner of an option based on a consideration has an equitable interest in the land; the other line of cases holding that the owner of such an option before its exercise has no interest, equitable or otherwise, in the land."

■ We do not find it necessary to decide in this case whether or not an option to purchase real estate, before it is exercised, is such an interest in land as will support a vendor's lien upon assignment of the option. We are concerned here with the broader question, viz., to ascertain, if possible, the intent of the parties, relative to the ownership of the property in suit, at the time the sale of the leases was made and the contract of purchase and sale was executed. In doing this, we may look to the circumstances surrounding the parties at the time they contracted, including the object, nature and subject matter of the agreement, and the preliminary negotiations between the parties leading up to the final transaction. Lemm v. Stillwater Land & Cattle Co. et al., 217 Cal. 474, 19 P.2d

785; Washoma Petroleum Co. et al. v. Eason Oil Co., 173 Okl. 430, 49 P.2d 709.

On or about the 24th day of May, 1941, appellee, Scott Etter, acting for himself and as trustee for appellee, Charles E. Logan, obtained from S. P. Yates and others a ninety day option contract to purchase certain sodium leases, permits, operating agreements and applications for the sum of $12,500, plus expenses, rental payments and attorneys fees. Upon the execution of this option contract, appellees set about to find a purchaser for the property at a profit to them.

The defendant, Etz, Myers & Robertson, a corporation, became interested in the purchase of the property. The first agreement or proposal, for such sale and purchase, was that appellees would convey to the defendant, Etz, Myers & Robertson, a corporation, a seven-eighth interest in the property for the consideration of $18,000, retaining to themselves a one-eighth interest, which would give them an overriding royalty. It was further stipulated that the defendant, Etz, Myers & Robertson, a corporation, would organize a New Mexico corporation, to hold title to the property with 2,000 shares of preferred stock. Of this preferred stock appellees were each to receive 500 shares with a guaranteed dividend of $6 per share per annum, which was the purchase price of the seven-eighths interest in the property to be conveyed to the defendant, Etz, Myers & Robertson, a corporation. From the $18,000, $12,500 was to be paid to S. P. Yates, under the terms

of the option contract, and $5,500 was to be paid to Scott Etter as the purchase price of an operating agreement, on a 2500 acre tract of land, held by him individually.

Subsequent to the foregoing proposal, and on July 17, 1941, the defendant, Etz, Myers & Robertson, a corporation, submitted to appellees a counter-proposal to purchase all of the property including appellees' one-eighth interest. This counter-proposal may be summarized as follows: The defendant, Etz, Myers & Robertson, a corporation, would organize a corporation with common stock from 350,000 to 400,000 shares and preferred stock of 10,999 shares, all of no par value. It proposed to pay appellees, as the purchase price of the property, $18,000 in cash, and issue to each of the appellees 500 shares of preferred stock, with a stipulated dividend of $6 per share per annum, payable quarterly. The preferred stock to be issued was to be secured by lien upon the leases and the equipment, together with the equity in the plant, pipelines and equipment owned by the defendants, Etz, Myers & Robertson, a corporation, or its successors in interest, subject to the lien held by the United States Government against the property for money to be advanced for the construction of a processing plant. This proposal was approved and accepted by appellee, Charles E. Logan, for himself and Scott Etter, on the date of submission, to-wit, July 17, 1941.

Pursuant to this agreement, and on August 2, 1941, the defendant, Etz, Myers & Robertson, a corporation, caused to be organized the appellant corporation, which assumed the obligations of the contract of the defendant, Etz, Myers & Robertson, a corporation, under date of July 17, 1941.

On August 9, 1941, appellant and appellees entered into a written contract, denominated agreement for compensation, for the purchase of the option contract and the interest of appellees in the property. By the terms of this agreement, appellees were each to receive 500 shares of preferred stock in the appellant corporation of the par value of $10 per share, and also were to receive, in lieu of any and all overriding royalties from production of the properties involved, the sum of $3,000 per annum in cash, payable quarterly at the end of each quarter. The first payment was to be made on the 12th day of November, 1941, and continuing during the entire time the corporation operated the properties. It was also understood that all amounts received by appellees by way of dividends upon the preferred stock should be deducted from the first cash payment to be made after receipt of such dividend. It was further provided in this contract that the preferred stock to be issued to appellees would be deposited in the trust department of the Mercantile National Bank of Dallas, Texas, where it should remain during the existence of the contract and should not be sold or transferred until the contract terminated.

It was further provided that appellant would assume the obligations of the defendant, Etz, Myers & Robertson, a corporation, under the agreement of July 17, 1941. The

obligation of this contract assumed by appellant, after modification by the contract of August 9, 1941, was the payment of $18,000, $12,500 due Yates and $5,500 due appellee, Scott Etter. It will be seen that appellant, under the contract of August 9, 1941, agreed to pay appellees for the seven-eighths interest in the property the cash sum of $18,000, and issue to each of them 500 shares of preferred stock, without any guaranteed dividend; and also agreed to pay each of the appellees the cash sum of $3,000 a year for their one-eighth overriding royalty.

Simultaneously with the execution of the contract of purchase and sale, dated August 9, 1941, appellees assigned to appellant the option to purchase theretofore obtained from S. P. Yates and others.

 Viewing the whole transaction between appellees and appellant, and its predecessors in interest, the surrounding circumstances and the situation of the parties, and applying the rule hereinabove set forth, it may safely be said that the true intent, of the parties in dealing with the property in suit, was to recognize in appellees, at all times, an equitable interest therein. It is admitted that if the legal title had passed from the optionor through appellees to appellant, appellees would have an implied vendor's lien to secure the payment of the balance of the purchase price of the property. Are appellees in any different position than they would have been had the legal title to the property passed through them to appellant? Did they, by permitting legal title to flow directly from the optionor to appellant exclude themselves from asserting an implied vendor's lien for the balance of the purchase price? We think not. The undisputed evidence in the record is that appellant, through its attorneys, prevailed upon appellees in order to simplify the transaction and as accommodation to it, to permit the transfer of the property directly from S. P. Yates, the optionor, to appellant. Having thus acquired the legal title to the property by direct transfer from the owner, it would be inequitable to permit appellant to take advantage of a situation suggested and created for its benefit, and to now say that appellees may not claim a vendor's lien upon the ground that the legal title to the property was never vested in them. "Equity regards that as done which ought to be done."

When this transfer was so made, at the instance of appellant, appellees were placed in the position of vendees in a contract for the sale and purchase of real estate. They became the equitable owners of the property and entitled to an implied vendor's lien for the purchase price of their interest, to-wit, a one-eighth interest as an overriding royalty. Thus, having arrived at the conclusion that appellees were the equitable owners of the property in suit, and having sold that interest, an implied vendor's lien arises in their favor to secure the payment of the purchase price. In 66 C.J. 1230, Sec. 1099, it is said:

"The vendor of an equitable estate or interest in realty has a lien for unpaid pur-

chase money whenever under the circumstances the vendor of a legal estate or interest therein would have a lien."

In Johns et al. v. Seeley, 94 Fla. 851, 114 So. 452, 453, Guy B. Seeley contracted to purchase from H. C. Johns a parcel of real estate situated in Orlando, Florida. The written purchase contract contained the terms and stipulations agreed to between them. Guy B. Seeley contracted to sell the land to Casey Driver and wife at a profit, with a provision, in the contract, that H. C. Johns would convey title direct to Driver. The transfer of the property was made directly from H. C. Johns to Casey Driver and wife, who paid Johns the balance of the purchase price due him on the property, but failed and refused to pay Seeley. Driver gave a mortgage on the land to a third party to secure a loan of $3200. Seeley brought suit for the balance of the purchase price and for the foreclosure of a vendor's lien. It was contended that Seeley was not entitled to a decree because he did not hold the legal title to the land in question, and therefore could not assert a vendor's lien. Johns held the legal title and that he could have asserted his lien for unpaid purchase money, is without question. The court in disposing of the case said:

" 'A vendor's lien is a right which the law by implication accords to the grantor of land, who has conveyed the title, and reserved no express lien, and has taken no security for the purchase money other than the personal obligation of the grantee, to subject the land in equity to the payment of the unpaid purchase money.' * * *

"The above is unquestionably the law as to the original grantor. But is a purchaser who contracts to purchase land from the owner of the legal title, on given terms and at a given price, and then sells the land to a second purchaser for a figure that would produce a profit to him over the price he was to pay the original owner, without remedy for the purchase money due him, when full provision is made in the contract with the second purchaser to pay the balance due on the first purchase price to the original owner, and that balance is actually paid, and then the first purchaser ignored as to the amount due him? The law does not sustain such view as we see it."

Further on in the opinion the court in quoting from 29 Am. & Eng.Ency, of Law, at page 733, said:

" 'That the lien may be enforced in favor of one not the grantor. Thus, when one has purchased without taking a deed, and has subsequently sold to a third party and had the land conveyed by the original owner according to his direction to the subvendee, the lien attaches in favor of the vendor, although he is not the grantor, and the legal title did not rest in him, but he owned and controlled it, and, having the equitable title, the legal outstanding in another, on his selling the same and causing the holder of the legal title to make conveyance to the other person, equity will regard the substance rather than the form,

and the lien arises in favor of the unpaid purchase money for the land conveyed.' "

See also Pace v. Berry et al., 176 Ky. 61, 195 S.W. 131.

■ It will thus be seen that the appellant recognized in appellees an interest in the property, viz., a one-eighth interest overriding royalty, for which they were to receive the sum of $3,000 per year, as long as the appellant corporation operated the property. Appellant received title to this interest, and paid the sum of $1,000 as part of the purchase price, but now argues that appellees are in no position to assert a vendor's lien for the balance of the unpaid purchase price. We cannot assent to this view. The principle on which the doctrine of an implied vendor's lien rests is one of natural justice, that one who gets the estate of another ought not in good conscience be allowed to keep it without paying the consideration. Fisher v. Shropshire, 147 U.S. 133, 13 S.Ct. 201, 37 L.Ed. 109; Lavin v. Lynch, 203 Mich. 143, 168 N.W. 1024, 2 A. L.R. 804; Martin v. Becker, 169 Cal. 301, 146 P. 665, Ann.Cas.1916D, 171.

Under the circumstances of this case, as disclosed by the record, the situation surrounding the parties at the time they contracted, including the object, nature and subject matter of the agreement, we do not think there is any question but that appellees were entitled to an implied vendor's lien for the unpaid balance of the purchase price due them from appellant.

■ Appellant also contends as a part of its argument under points one and two, although scarcely pertinent to either point, that under the contract of July 17, 1941, and August 9, 1941, appellees agreed to accept, in lieu of an overriding royalty as a consideration for the transfer of their option, payment in preferred stock of appellant corporation. It is argued that the agreement of appellant to pay, and of appellees to accept, dividends on the preferred stock, while the plant was being built and put into operation, contravened 1941 Comp., Sec. 54-317, and is unenforcible; that appellees, by agreeing to accept compensation for the option in dividends, are in no position to assert that the property purchased from S. P. Yates passed to appellant subject to a vendor's lien in their favor.

We are unable to accept either the construction placed upon the contract by appellant, or the argument in support thereof. If we were dealing, alone, with the contract of July 17, 1941, there would be much merit to appellant's argument. It is true under the terms of this contract, appellees agreed to accept preferred stock of no par value with a guaranteed dividend of $6 per share per annum as part of the consideration for their interest in the property and the assignment of the option contract. The dividends were to be paid while the plant was being built and put into operation, as well as continually thereafter, from operations, so long as the plant should operate. This contract was modified and superseded by the contract of August 9, 1941. In lieu of issuing the preferred stock, with the guaranteed dividend, of $6 per

share per annum, to be paid appellees while the plant was being built and placed in operation, it was agreed to issue to appellees preferred stock of the par value of $10 per share with no stipulated dividends. In addition to the stock, appellees were each to receive, for their one-eighth overriding royalty from production, the sum of $3,000 per year during the entire time appellant operated the property. These payments to be reduced in an amount equal to the dividends, if any, to be received by appellees upon the preferred stock.

Appellant's third point is sub-divided into four propositions. What we have said under points 1 and 2 sufficiently disposes of proposition 1. Proposition 4 has not been followed up and argued by appellant in its brief, so it will be considered abandoned. Candelaria v. Gutierrez, 30 N. M. 195, 230 P. 436.

Under propositions 2 and 3 of point 3, it is argued that appellees, having accepted stock in the appellant corporation as security for the unpaid balance of the purchase price, waived their implied vendor's lien; and, there being no vendor's lien, a court of equity is without jurisdiction to hear and determine the case. This premise is unsound. As heretofore pointed out, if we were dealing solely with the contract of July 17, 1941, this argument would be correct and the authority cited by the appellant would be in point. Appellant relies on Dalliba v. Riggs, 7 Idaho 779, 67 P. 430, as authority for the rule here contended for. But it will be seen, from reading the opinion in this case, that the facts are quite different from those in the case at bar. The contract the court was considering in Dalliba v. Riggs, supra, provides that the stock shall be issued to the president of a bank, to be named by the first party as trustee. The dividends declared and due upon the stock shall be paid to the trustee, for the use and benefit of the party of the first part, until such payments, in the aggregate, amount to the sum of $60,000. Whenever the amount of $60,000 shall have been paid, the stock, bonds or other security, delivered to the trustee, shall become the absolute property of the corporation. No such provision is to be found in the contract under consideration in the case at bar. Under the agreement of August 9, 1941, appellees were to be the owners of the stock to be issued, although prohibited from selling or transferring it until the contract terminated. The cash payment they were to receive, was the consideration for the relinquishment of their one-eighth interest as an overriding royalty. No security was offered or received for this. No waiver is here involved.

There is no merit in appellees' fourth point advanced for the reversal of this case. Appellants' theory under this proposition is that the whole transaction between appellees and appellant was a joint enterprise; and any compensation to be received by appellees, for their interest in the property, and the assignment of the option contract, was to come from appellant's operation of the property. This is

contrary to the state of the record. If appellees had retained their one-eighth interest, as an overriding royalty, it is manifest they would have to look to the successful operation of the property by appellant, in order to realize anything from their royalty interest. But, having sold their interest to appellant, for a cash consideration, and the whole estate having been mortgaged to the extent of its value, appellant is now in no position to say that appellees donated their property to it for speculative purposes. If appellant has failed to realize anything from its venture, it should not be placed at the door of appellees, and thus deprive them of their property, as well as their lien for the purchase price.

Intervenor assigns the following errors:

1. The trial court erred in holding that the plaintiff had an implied vendor's lien on the property involved herein.

2. The trial court erred in holding that plaintiffs' implied vendor's lien was prior and paramount to the lien of intervenor.

As to intervenor's first assignment of error, what we have said under points 1 and 2 of appellant case disposes of this question, and we do not think it necessary to elaborate further.

It is urged that the court erred in holding that appellees' implied vendor's lien was prior and paramount to the lien of intervenor. The trial court found that intervenor's mortgage was executed and delivered on October 27, 1942, and filed for record on December 21, 1942; that appellees filed their notice of lis pendens, in the office of the County Clerk of Eddy County, New Mexico, on the 18th day of July, 1942, and had no actual notice of intervenor's claim of an equitable lien against the property on January 28, 1942. These facts are amply supported by the evidence. Our statute relative to notice of lis pendens and the filing thereof, 1941 Comp., Sec. 19-309, provides, among other things, as follows:

"* * * any person whose conveyance or encumbrance is subsequently executed, or subsequently registered shall be considered a subsequent purchaser or encumbrancer; and shall be bound by all the proceedings, taken after the filing of such notice, to the same extent as if he was made a party to the said action."

1941 Comp., Sec. 13-201, provides for the recordation of all instruments affecting real estate in the office of the county clerks in the county in which the real estate affected thereby is situated. By Sec. 13-203 it is provided:

"No deed, mortgage or other instrument in writing, not recorded in accordance with section 4786 (§ 13-201), shall affect the title or rights to, in any real estate, of any purchaser, mortgagee in good faith, or judgment lien creditor, without knowledge of the existence of such unrecorded instruments."

It is not claimed that appellees had actual notice of any equitable lien claimed by intervenor; hence this phase of the question will not be considered. Intervenor's mortgage was not filed and recorded in the of-

fice of the County Clerk of Eddy County, New Mexico, until long after the lis pendens notice was filed by appellees. Under the plain language of the statute, he is to be considered a subsequent purchaser, and necessarily is charged with notice of the fact that his mortgagor's title was being attacked in this action; so he must stand or fall with his mortgagor. Wilson v. Robinson, 21 N.M. 422, 155 P. 732, 735, Ann.Cas. 1918C, 49.

In Wilson v. Robinson, supra, we approved the rule announced in 21 Am. & Eng.Ency. of Law, page 652, where it is said:

"Under those recording acts which declare conveyances invalid against all persons except the parties thereto and persons having notice thereof, unless recorded, and not merely against subsequent bona fide purchasers or incumbrancers, one who takes but does not record a conveyance prior to the lis pendens is a pendente lite purchaser."

Under the terms of the statute, intervenor falls squarely within this rule and was a pendente lite purchaser and is chargeable with notice. Appellant's title being burdened with an implied vendor's lien in favor of appellees, intervenor acquired no better title than his mortgagor had; hence his mortgage became and was subsequent and inferior to the lien of appellees.

Intervenor urges that, in view of the finding of fact number 24, to the effect that he had an equitable lien on the property, of which appellees had no knowledge, from January 28, 1942, his equitable lien is not affected by the filing of the notice of lis pendens. In this, he is in error. He would be in no better position if he had taken his mortgage on that date and failed to record it. The date of the recordation is controlling where the party to be affected had no actual notice of the existence of the lien.

Finding no error, the judgment will be affirmed, and

It is so ordered.

SADLER, C. J., and MABRY, BICKLEY, and BRICE, JJ., concur.